**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CASE NO. 5:11-CV-62**

NANCY CARPENTER                                                                    PLAINTIFF

V.

PURCHASE AREA DEVELOPMENT DISTRICT
and
MUTUAL OF OMAHA INSURANCE COMPANY                            DEFENDANTS

## MEMORANDUM OPINION

This administrative review is before the Court on the Plaintiff's briefs for Judgment on

the Administrative Record (DN 20).  Defendant has responded (DN 21) and Plaintiff has replied

(DN 22).  The Court has reviewed the administrative claim file (DN 19).  This matter is now ripe

for adjudication.

## BACKGROUND

Plaintiff, Nancy Carpenter, brings this action under §1132(a)(1)(B) of the Employment

Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA").  She alleges that

her application for long-term disability benefits under a group disability policy was improperly

denied by Defendant.

Carpenter was a participant in a long-term disability plan ("Plan") issued to her former

employer, Paducah Area Development District ("PADD"), by United of Omaha Life Insurance

Company ("UOO").  Carpenter was employed by PADD as a Kentucky Home Care Case

Manager/Consumer Directed Options Support Broker.  Generally, the Plan pays benefits to a

participant who is not able to perform the material duties of his or her occupation.  The Plan

provided the following definition of "Disability:"

1

**Disability and Disabled** means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:

(a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

(b) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a monthly benefit has been paid for 3 years, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation.

Disability is determined relative to Your ability or inability to work.  It is not determined by the availability of a suitable position with Your employer.

AR, DN 19 at p. 58-59.

The Plan defined "Material Duties" as "the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified . . . One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis." AR, DN 19 at p. 59.  The Plan defined "Regular Occupation" as follows:

… the occupation You are routinely performing when you Disability begins. Your regular occupation is not limited to the specific position you held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT) . . . To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region.

AR, DN 19 at p. 60.

On October 12, 2009, Carpenter applied to UOO for benefits under the Plan, listing "severe abdominal pain, fatigue, malaise" as the reason she was unable to work.  AR, DN 19-2 at p. 24.  Carpenter stated that she first began experiencing her symptoms in December of 2004.

2

Carpenter continued working until October 22, 2009, when she resigned her position with PADD.[1]

UOO obtained the records of Carpenter's treatment with the medical providers she identified in her application: Dr. Danny Butler, Internal Medicine; and Dr. Joseph Mayo, Vascular Surgeon.  AR, DN 19-2 at p. 25.  These records and Dr. Butler's attending physician's statement indicated that Carpenter was diagnosed with abdominal pain, portal vein thrombosis,[2] and degenerative joint disease of the knees.  AR, DN 19-2 at p. 22.  Carpenter was on anti-coagulation therapy and received venipuncture blood draws intermittently.  AR, DN 19-1 at p. 19–45.  Records show that Carpenter suffered from abdominal distention, abdominal tenderness, and pain.  *Id.*  A January 21, 2010 CT scan showed hepatocellular disease with diffuse fatty infiltration in the liver, esophageal varices (dilated veins), splenomegaly (enlarged spleen), and ileus.  AR, DN 19 at p. 79.  These conditions were all due to the portal vein thrombosis.  *Id.*

---

[1] In the Employer's Statement, PADD noted that Carpenter had exhausted all of her sick leave. AR, DN 19-2 at p. 28.

[2] The Merck Manual explains that portal vein obstruction results from thrombosis (blood clot) or narrowing of the portal vein, which brings blood to the liver from the intestines.   The Merck Manual goes on to explain that:

Because the portal vein is narrowed or blocked, pressure in the portal vein increases.  This increased pressure (called portal hypertension) causes the spleen to enlarge (splenomegaly).  It also results in dilated, twisted (varicose) veins in the esophagus (esophageal varices) and often in the stomach (portal hypertensive gastropathy).  These veins can bleed profusely.  Fluid accumulation in the abdomen (called ascites) is not common but may deleveop when the blockage of the portal vein is accompanied by liver congestion or damage when large amounts of fluids are given intravenously to treat major bleeding from ruptured varices in the esophagus or stomach.

Merck Manual, Portal Vein Thrombosis (2007), available at: http://www.merckmanuals.com/home/liver_and_gallbladder_disorders/blood_vessel_disorders_of_the_liver/portal_vein_thrombosis.html.

On February 27, 2009, Carpenter saw Dr. Butler with complaints of edema.  Carpenter saw Dr. Butler again on March 3, 2009, with complaints of moderate shortness of breath and moderate swelling in her lower extremities.  AR, DN 19-1 at p. 41.  During this visit Dr.  Butler noted evidence of abdominal distention and measured Carpenter's abdomen to be 36 inches in circumference.  *Id*. at p. 40.  On March 10, 2009, Carpenter saw Dr. Butler for a follow up regarding her shortness of breath.  AR, DN 19-1 at p. 39.  Carpenter also complained of fever, chills, and pain from her chest down.  *Id*.  At this time, Carpenter reported that her pain patch was working well to relieve her pain, but it made her nauseated.  *Id*.  On April 4, 2009, Carpenter had a follow up visit to Dr. Butler for the edema.  AR, DN 19-1 at p. 36.   During this visit, Dr. Butler noted that the abdomen was non-tender, non-distended, and without rebound.  *Id*.  Dr. Butler also noted that there were no abdominal masses, no hepatomegaly, and no splenomegaly. *Id*.

On October 6, 2009, Carpenter saw Dr. Butler complaining of visual disturbances, worsening abdominal pain, and the need to take more pain medication.  AR, DN 19-1 at p. 23. Dr. Butler noted evidence of generalized abdominal distention and abdominal tenderness.  *Id*.  In addition to the visual disturbances, Dr. Butler's assessment at this visit was as follows: (1) abdominal pain, an established problem which was worsening; (2) Thrombosis/Embolism-Vein, an established problem which was stable and improved; and (3) long-term anticoagulation therapy, an established problem which was stable and improved.  *Id*.

On October 12, 2009, Carpenter saw Dr. Butler for a follow up regarding her abdominal pain and the portal vein thrombosis, which were both noted as "chronic and uncontrolled," and degenerative joint disease of the knee, which was noted as "chronic and stable."   AR, DN 19-1 at p. 21.  At this visit, Carpenter weighed 127 pounds and her waist measured 34 ½ inches.  *Id*. at

4

p. 21-22.  Carpenter reported generalized fatigue and complained that, due to the pain, "she's having to lay down more often and take more of her pain meds." *Id*.  Dr. Butler noted evidence of abdominal distention and tenderness with normal bowel sounds, and evidence of crepitus and pain with palpitation of both knees. *Id*. at p. 22.  Dr. Butler's assessment at this visit was as follows: (1) Carpenter's abdominal pain and portal vein thrombosis were established problems which were worsening; (2) her DJD was an established problem which was stable, improved; (3) her long-term anti-coagulation therapy was an established problem which was stable and improved; and (4) her fatigue was an established problem which was worsening. *Id*.  Dr. Butler's notes state that Carpenter was to continue to take her medications as prescribed. *Id*.

Dr. Butler submitted an attending physician's statement on October 20, 2009, listing Carpenter's primary diagnosis as abdominal pain and portal vein thrombosis, and a secondary condition of degenerative joint disease of the knee.  AR, DN 19-2 at p. 22.  Dr. Butler noted that Carpenter had a poor prognosis for recovery and that his treatment plan for Carpenter to return to work or to prior level of function was comprised solely of medicine management. *Id*.  He noted that, in an eight-hour workday, Carpenter could sit for four hours, stand for one hour, and walk for one hour. *Id*.   Dr. Butler also noted that Carpenter was restricted from driving or taking care of patients after taking narcotics, and that she was limited in lifting, bending, squatting, crawling, and climbing. *Id*. at p. 23.

On March 10, 2010, UOO denied Carpenter's claim for LTD benefits on the basis that the "[a]vailable medical documentation does not appear to support restrictions and limitations to preclude sitting 6 hours out of an 8-hour day with ability to occasionally make position changes or occasionally lift up to 10 pounds."  AR, DN 19 at p. 87-89.  Thus, because Carpenter could

perform the material duties of her regular occupation as determined by the vocational analyses, UOO determined that she was not entitled to benefits under the Plan.

Carpenter appealed UOO's initial decision denying her claim.  In support of her appeal, Carpenter submitted additional medical documentation: the January 21, 2010 CT Scan and a report by Dr. Atul Chugh.[3]  According to Carpenter's attorney, Carpenter saw Dr. Chugh at the request of the Social Security Administration.  AR, DN 19 at 77.  Dr. Chugh's March 13, 2010 report noted that Carpenter was positive for bilateral knee pain with erythematous changes over the knee along with swelling bilaterally, more pronounced on the left than on the right. AR, DN 19 at p. 81-82.  Additionally, Carpenter's abdomen was distended, an umbilical hernia was noted, and hypoactive bowel sounds were heard.  *Id*. at p. 81.  The report summarized Carpenter's medical history, noting that after having gastric bypass in 2002, Carpenter was noted to have a small tumor near the bypass site.  *Id.* at p. 80.  As a result, Carpenter had a small bowel resection.  *Id*.  Post-resection, Carpenter had multiple blood clots to the liver, spleen, and the small intestine with superior mesenteric vein thrombosis.  *Id*.  Dr. Chugh agreed with the Mayo Clinic's opinion to keep Carpenter on anticoagulation, but noted that as a result of this treatment, Carpenter is always bloated, has difficulty with digestion, has bowel disturbances, and has constant pain in the belly.  *Id*.  Dr. Chugh's report also noted that Carpenter reported having problems with her daily activities as a result of the pain and can sit for 10 to 15 minutes, stand for only 20 minutes, walk for only 20 to 30 minutes, and can carry only 10 pounds.  *Id*. at p. 80-81.  With respect to Carpenter's limitations, the report went on to note that there is no difficulty with fine motor activities, speaking, or listening and that Carpenter could normally travel for an hour.  *Id*. at p. 81.  Dr. Chugh concluded that Carpenter had "short gut syndrome and diffuse

---

[3] It appears the UOO had already received the CT scan prior to its initial denial of Carpenter's claim.

amounts of fairly pronounced abdominal distention and pain" and that her "symptoms seems very much in line with diffuse amounts of thrombosis that she has had." *Id*. at 82.  He further concluded that Carpenter's "clots seem to have been fairly large" and that as a result, he felt "that the patient has the impairment that she has, namely, the ability to sit for 10 to 15 minutes, stand for 20 minutes, walk for 20 to 30 minutes, and can carry 10 pounds." *Id*.  As a result of the "gross amounts of abdominal distention and the pain," Dr. Chugh thought Carpenter would benefit from further expertise.  *Id*.

UOO upheld its denial of Carpenter's benefits by letter on June 8, 2010.  AR, DN 19 at p. 64.  As its basis for its denial, UOO stated that the records indicated Carpenter has had the abdominal distention and portal vein thrombosis conditions for some time and that they are established problem, noted to be "stable and improved." *Id*. at p. 68.  Thus, UOO concluded that there was no documentation of a significant change in these conditions.  *Id*.  UOO further concluded that the "medical documentation does not support restrictions and limitations due to any functional or psychiatric impairment that would have to preclude Ms. Carpenter from performing the material duties of her regular occupation and does not support a disability." *Id*.  Carpenter now moves this Court to find that UUO's decision to deny her LTD benefits was arbitrary and capricious.

## STANDARD

To begin with, the Court recognizes that "in an ERISA claim contesting a denial of benefits, the district court is strictly limited to a consideration of the information actually considered by the administrator." *Killian v. Healthsource Provident Adm'rs, Inc.,* 152 F.3d 514, 522 (6th Cir.1998).  The administrative record includes all documentation submitted during the administrative appeals process "because this information was necessarily considered by the plan

administrator in evaluating the merits of the claimant's appeal." *Kalish v. Liberty Mut.,* 419 F.3d 501, 511 (6th Cir.2005). ERISA and federal regulations enacted under ERISA "require 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials." *Black & Decker Disability Plan*, 538 U.S. at 825 (citing 29 U.S.C § 1133; 29 CFR § 2560.503-1 (2002)).

Generally, courts "review a plan administrator's denial of ERISA benefits de novo." *Moon v. Unum Provident Corp.,* 405 F.3d 373, 378 (6th Cir.2005) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)). However, when "a plan vests the administrator with complete discretion in making eligibility determinations, such determinations will stand unless they are arbitrary or capricious." *Id.* "The arbitrary and capricious standard is the least demanding form of judicial review and is met when it is possible to 'offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Admin. Comm. of the Sea Ray Employees' Stock Ownership & Profit Sharing Plan v. Robinson,* 164 F.3d 981, 989 (6th Cir.1999) (citation omitted). "Consequently, a decision will be upheld 'if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.'" *Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Cir.2006) (citations omitted).

Still, while the arbitrary and capricious standard is deferential, it is not "'without some teeth." *McDonald v. W.-S. Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir.2003) (citation omitted). A court's obligation to review the administrative record "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id.* As the Sixth Circuit has noted, without such a review "courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a

8

single piece of evidence—no matter how obscure or untrustworthy—to support a denial of a claim for ERISA benefits." *Id.*

## DISCUSSION

The Plan provides that the policyholder, PADD, delegated the discretion to determine eligibility for benefits and to construe and interpret the terms and provisions of the Plan to UOO. AR, DN 19 at p. 57.  Accordingly, this Court will apply the arbitrary and capricious standard of review. *See Moon*, 405 F.3d at 378.

## I.  UOO's Review and Decision

To be considered disabled under the Plan, a significant change in Carpenter's mental or physical functional capacity must have occurred which renders her unable to perform at least one of the material duties of her occupation.  AR, DN 19 at p. 58-59.  UOO denied Carpenter's claim for LTD benefits because it determined Carpenter did not met the Plan's definition of disabled. In her brief, Carpenter contends that UOO's decision to deny her claim was arbitrary and capricious because it was not supported by substantial evidence and was at odds with the medical evidence in the administrative record.  Carpenter also takes issue with UOO's failure to obtain a physician's opinion in making its decision and in failing to consider Carpenter's receipt of Social Security disability benefits.

### 1.  Conflict of Interest

Although neither party discusses the possibility of a conflict of interest in this case, the Court must consider conflicts of interest in situations where the plan authorizes an administrator both to decide whether an employee is eligible for benefits and to pay those benefits.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (208); *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165

(6th Cir. 2007).  A conflict of interest is just one factor considered in the Court's determination; it does not change the standard of review.  *Glenn*, 554 U.S. at 116-17.

Here, UOO is responsible for evaluating claims filed under the Plan.  AR, DN 19 at p. 57. Additionally, the ERISA Summary Plan Description states that "[t]he benefits under the Plan(s) are fully insured by the insurance company shown on Your Certificate of Insurance under a group insurance policy issued by such Company."  AR, DN 19 at p. 55.  The insurance company shown on the Certificate of Insurance is United of Omaha Life Insurance Company.  AR, DN 19 at p. 28.  Thus, UOO pays benefits in addition to evaluating claims.  "In such a circumstance, 'every dollar provided in benefits is a dollar spent by . . . [UOO]; and every dollar saved . . . is a dollar in [UOO's] pocket.'"  *See Glenn*, 554 U.S. at 112 (quoting *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 144 (3d Cir. 1987)).  Furthermore, UOO based its denial of Carpenter's claims based upon the in-house file reviews conducted by Nurses Grancer and Rosenstock and Dr. Reeder (although he gave no individual report or opinion) and did not employ an outside physician to conduct an independent review.

Although we have found no direct evidence in the record that UOO's potential conflict of interest tainted its decision-making process, "the potential for self-interested decision-making is evident" in such a situation.  *Calvert*, 409 F.3d at 292.  As the Court of The Sixth Circuit has stated, "[t]he Supreme Court made clear in *Glenn* that such a conflict is a red flag that may trigger a somewhat more searching review of a plan administrator's decision . . . ." *Schwalm v. Guardian Life Ins. Co. of Am.,* 626 F.3d 299, 311–12 (6th Cir.2010) (citing *Glenn*, 554 U.S. at 114).  Accordingly, the Court will consider this potential conflict of interest in determining whether UOO's decision was arbitrary and capricious.

### 2.  UUO's Review of Carpenter's Claims

This Court must determine if UOO's decision denying Carpenter's claim was "the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *See Evans,* 434 F.3d at 876.  Carpenter contends that UOO's reasoning is not supported by substantial evidence, as its position and conclusions are inaccurate and directly at odds with the medical evidence in the administrative record.  Carpenter further contends that UOO offers no other basis for its denial of her claim, did not have her examined by a physician, and did not ask a physician to review her medical records.  UOO responds that, because its healthcare professionals' opinions were based on all of the available medical and vocational evidence, it has offered a reasoned explanation based on the evidence for its denial.

To be considered disabled under the Plan, a significant change in Carpenter's mental or physical functional capacity must have occurred which renders her unable to perform at least one of the material duties of her occupation.  AR, DN 19 at p. 58-59.  In her brief, Carpenter discusses the duties of her job with PADD, which included travel by automobile to eight different counties in Western Kentucky.  In support of her argument that UOO acted arbitrarily and capriciously, Carpenter asserted that UOO ignored Dr. Butler's statement that she should not drive or take care of patients after taking narcotic pain medication.  UOO contends that its decision was not arbitrary and capricious because it focused on Carpenter's functional capacity to perform the material duties of her *occupation* instead of her *job* with PADD.

The Plan's definition of "Occupation" includes a statement that "Your regular occupation is not limited to the specific position you held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT) . . ." AR, DN 19 at p. 60.  Thus, Carpenter's specific job requirements with PADD are not necessarily

material duties of her occupation, as defined under the Plan.  Based upon a job analysis provided by Carpenter's employer,[4] and the U.S. Department of Labor Dictionary of Occupational Titles ("DOT"), UOO's Vocational Rehab Department found that Carpenter's position was most closely related to two DOT occupation titles: (1) social worker, medical and (2) caseworker. AR, DN 19-2 at p. 58.  Both of these DOT occupational titles are sedentary physical demand occupations.  *Id*.  Therefore, UOO determined that Carpenter's occupation required occasional standing, walking, sitting, pulling, lifting, carrying, and pushing up to 10 pounds, reaching, handling, and fingering.  AR, DN 19-2 at p. 59- 64.

UOO Nurse Julie Grancer made the initial review of Carpenter's LTD Claim.  In making her review, Nurse Grancer considered the following: (1) Carpenter's MTD Claims Employee's Statement, (2) Dr. Butler's Attending Physician's Statement, (3) Progress note and laboratory by Jeffery Ward, and (4) Dr. Butler's encounter notes.  Nurse Grancer noted that there was no indication of abnormal bleeding or poorly controlled blood pressure as is sometimes seen with portal vein thrombosis.  AR, DN 19-2 at p. 55.  Additionally, Nurse Grancer found that there were "no current vital signs to reflect pain is causing a systemic medical issue or indication of subjective limitations.  There's no pain treatment change."  *Id*.  Based on her review, Nurse Grancer opined that there was no support for restrictions and limitations that would preclude sitting for 6 hours out of an 8-hour day with the ability to occasionally change positions and occasionally lift up to 10 pounds.  *Id*. at p. 56.

In the March 10, 2010 letter denying Carpenter's claim, UOO recited the terms of the Policy and the information used to make its determination, stated that Carpenter's occupation

---

[4] A Job Analysis, submitted by PADD, showed that Carpenter's position required travel by automobile about 40% of the time and required frequent sitting, and occasional standing, walking, stooping, balancing, reaching, and light lifting.  AR, DN 19-2 at p. 31.

was a sedentary physical demand occupation, and recounted various details of Carpenter's medical evaluations.  AR, DN 19 at p. 87-90.  UOO referenced the October 6 and October 12, 2009 visits to Dr. Butler and acknowledged the evidence of abdominal distention, abdominal tenderness, and crepitus and pain with palpitation in both knees.  *Id.* at 89.  However, UOO concluded as follows:

> Based on the medical documentation, it was determined, in regards to your abdominal pain there was no current vital signs to reflect pain is causing a systemic medical issue or indication of subjective limitations.  There is no pain treatment change.  Your examinations have revealed intermittent abdominal distention with tenderness as sole abnormality.  Your [sic] neurologically intact with normal motor, sensation, reflexes and gait.  There's no indication of abnormal bleeding seen or poorly controlled blood pressure as sometimes seen in portal vein thrombosis. Available medical documentation does not appear to support restrictions and limitations to preclude sitting 6 hours out of an 8-hour day with ability to occasionally make position changes or occasionally lift up to 10 pounds.

> *Id.*

UOO's minimal analysis focused on the symptoms Carpenter does not exhibit, such as abnormal bleeding or poorly controlled blood pressure, instead of focusing on the symptoms she does exhibit and then analyzing how these symptoms would not prevent her from performing the material duties of her occupation.  Although UOO notes that there was no pain treatment change, it failed to address that Carpenter's abdominal pain was worsening as of her October 6 and 12 visits to Dr. Butler, that her duragesic patch made her nauseous, and that she was having to increase her pain medication and lay down more.  UOO disregarded Dr. Butler's opinion regarding Carpenter's limitations and restrictions but did not expressly explain why it did so.  Further, UOO did not explain the medical evidence upon which Nurse Grancer based her opinion that Carpenter could perform the material duties of her occupation.

After Carpenter appealed the decision denying her claim, UOO submitted all of Carpenter's medical records and the additional records submitted with her appeal to UOO Nurse Nancy Rosenstock for review.  On May 13, 2010, Nurse Rosenstock issued her findings with respect to Carpenter's claim.  Nurse Rosenstock reviewed Dr. Chugh's report, along with the previous medical documentation previously provided, but found that the "overall medical documentation appears to indicate that claimant would be able to sit up to 6 hours out of an 8 hour day [with ability to change position as needed]; stand up to 1 hour [20 minute intervals]; and walk up to 1 hour [30 minute intervals], and lift/carry 10 lbs., per Department of Labor guidelines."  AR, DN 19-2 at p. 51.  She concluded that, "[b]ased on the medical analysis, Carpenter's "restrictions and limitations do not appear to be supported from 10/19/09 forward, which would preclude claimant from performing predominately sedentary physical activities . . . ."  AR, DN 19-2 at p. 51.

In the letter denying Carpenter's appeal, UOO states a different definition of "disability" than appears in the Policy and in the first denial letter.[5]  This letter then goes on to state the material duties of the DOT occupational titles most closely related Carpenter's occupation. There is then a one page recitation of the technical aspects of Carpenter's condition, visits to Dr. Butler, the January 2010 CT scan, and Dr. Chugh's medical assessment.  UOO then provides its analysis:

---

[5] The letter states, that "[t]he provision(s) in the policy on which the denial of the claim is based state(s) the following:

> Total Disability and Totally Disabled, for other than a pilot, means that because of an Injury or Sickness: (a) You are unable to perform all of the material duties of Your regular occupation on a full-time basis; and (b) You are unable to generate Current Earnings which exceed 20% of Your Basic Monthly Earnings due to that same Injury or Sickness.

AR, DN 19 at p. 64.

> . . . The most recent office visit with Dr. Butler, dated October 12, 2009, indicated evidence of abdominal distention and abdominal tenderness with normal bowel sounds.  Evidence of crepitus and pain with palpation of both knees were noted; however, records indicate Ms. Carpenter has had this condition for some time and is an established problem, which was noted to be "stable and improved."  It was also noted that she had been on long-term anticoagulation therapy that was "stable and improved."  There is no documentation of a significant change in these conditions.  Dr. Butler indicated on the attending physician's statement completed October 9, 2009, that Ms. Carpenter was able to sit up 4 hours, stand up to 1 hour, and walk up to 1 hour out of an 8 hour day and lift/carry up to 25 pounds.  The clinical evidence in file does not support that Ms. Carpenter would be unable to perform the material duties of her regular occupation, as performed in the national economy.

AR, DN 19 at p. 68.  UOO thus concluded that the "medical documentation does not support restrictions and limitations due to any functional or psychiatric impairment that would have to preclude Ms. Carpenter from performing the material duties of her regular occupation and does not support a disability."  *Id*.

UOO's limited commentary in its second denial letter contains little more than conclusory assertions.  UOO appears to take the position that Carpenter was not disabled because there was no documentation of a significant change in her degenerative joint disease or anti-coagulation therapy, which were noted as stable.  However, UOO does not address that the side-effects of the anti-coagulation therapy (bloating, difficulty with digestion, bowel disturbances, and constant pain in the belly) and how those side-effects may affect Carpenter's ability to perform the material duties of her occupation.  Furthermore, UOO does not explain its apparent dismissal of the medical documentation that Carpenter's abdominal pain was worsening as of October 6, 2009, and that, as of October 12, 2009, her abdominal pain and portal vein thrombosis were chronic, uncontrolled, and worsening and that she had to lay down more and take more pain medication.

Although UOO acknowledged Dr. Butler's and Dr. Chugh's opinions regarding Carpenter's limitations and restrictions, it then summarily rejects them without giving a reason for doing so.[6]  The Court is aware that "[n]othing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians."  *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).  However, "a plan administrator may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician."  *Evans*, 434 F.3d at 877; *see Calvert*, 409 F.3d at 296 (finding a reviewing physician's report to be inadequate because, even though the reviewing physician did mention the claimant's doctors by name, he did not explain why their conclusions were rejected out-of-hand).  Here, the only explanation offered as to why Dr. Butler's and Dr. Chugh's opinions were disregarded was that "[t]he clinical evidence does not support that Ms. Carpenter would be unable to perform the material duties of her regular occupation . . ."  AR, DN 19 at 68.  UOO did not pinpoint any evidence that contradicted Dr. Butler's and Dr. Chugh's opinions or provide its own analysis regarding how Carpenter was able to perform the material duties of her occupation.  "Logically, [UOO] could have made a reasoned judgment only if it relied on medical evidence that assessed [Carpenter's] physical ability to perform job related tasks."  *See Elliot v. Metropolitan Life Insurance Co.*, 473 F.3d 613, 618 (6th Cir. 2006).  "Put differently, medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability."  *Id*.

UOO instead chose to credit the opinions of Nurses Grancer and Rosenstock that Carpenter's condition did not preclude her from performing the duties of her regular occupation,

---

[6] Dr. Chugh concluded that Carpenter could only sit for 10 to 15 minutes, stand for 20 minutes, walk for 20 to 30 minutes, and can carry 10 pounds.  AR, DN 19 at p. 82.  Dr. Butler concluded that, in an eight-hour workday, Carpenter could sit for four hours, stand for 1 hour, and walk for 1 hour.  AR, DN 19-2 at p. 22.

and Dr. Reeder's statement of agreement with Nurse Grancer's assessments.[7]  Although there is no "discrete burden of explanation" placed upon plan administrators "when they credit reliable evidence that conflicts with a treating physician's evaluation," *Black & Decker Disability Plan,* 538 U.S. at 834, the plan administrator must offer "a reasonable explanation based upon the evidence for its decision . . . to rely upon the medical opinion of one doctor over that of another doctor." *Roumeliote v. Long Term Disability Plan for Employees of Worthington Industries,* 475 F.Supp.2d 742, 746 (S.D. Ohio 2007), *aff'd* 292 Fed. Appx. 472 (6th Cir.2008).  Furthermore, "when a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism." *Moon v. Unum Provident Corp.,* 405 F.3d 373, 381-82 (6th Cir.2005).  Lacking here is a reasonable explanation as to why UOO credited the opinions of two of its nurses, who performed a file-only review.  That UOO gave greater weight to these non-treating healthcare professionals in its employ for no apparent reason lends weight to the conclusion that UOO acted arbitrarily and capriciously.

Finally, the Court notes that conducting a file review only is not necessarily arbitrary and capricious. *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 296 (6th Cir.2005) ("[W]e find nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination.").  It is, however, a factor to be considered in the Court's determination. *Smith v. Continental Cas. Co.,* 450 F.3d 253, 263 (6th Cir.2006). "[T]he failure to conduct a physical examination-especially where the right to do so is specifically reserved in the plan-may, in some cases, raise questions about the thoroughness and accuracy of the benefits

---

[7] Defendant states that Dr. Thomas A. Reeder, UOO's Senior Vice President and Medical Director, carefully reviewed the claim in its entirety and specifically approved its medical aspects.  However, nowhere in the Administrative Record does Dr. Reeder provide an opinion regarding Carpenter's limitations beyond  merely stating that Dr. Reeder "agree[d] with the NCM assessment."  AR, DN 19-2 at p. 44.

determination." *Calvert,* 409 F.3d at 295.  Here, UOO's right to conduct a physical examination is explicitly provided for in the Plan.  AR, DN 19 at p. 49.  A physical examination of Carpenter was never requested.  Therefore, the Court considers this factor in its analysis.

UOO's failure to conduct a physical exam is especially troublesome in this case because the extent or severity of Carpenter's abdominal pain is largely subjective, although the record is replete with objective medical evidence of the cause of this pain.  Dr. Chugh, after examining Carpenter, noted that there was fairly pronounced abdominal distention and pain, which was in line with the fairly diffuse amounts of thrombosis she has had.  If UOO believed that Carpenter's condition did not prevent her from being able to perform her occupation, then UOO could have ordered its own physical examination instead of summarily concluding that the medical documentation did not support such restrictions.

### 3.  Social Security

Lastly, Carpenter contends that UOO failed to consider or rebut her award of Social Security disability benefits.  According to Carpenter's complaint, she "received a fully favorable disability decision dated April 6, 2010, by an Administrative Law Judge awarding her supplemental security income benefits which further details the medical evidence supporting her disability under the Plan."  DN 1 at ¶ 17.  UOO issued its letter upholding the denial of Carpenter's claim on June 8, 2010.  AR, DN 19 at p. 64.  In its review of UOO's decision, the Court may not consider any evidence not presented to the administrator unless the evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process or alleged bias.  *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).  The Sixth Circuit has said that evidence of a SSA disability determination "does not fall under the exception to the rule that federal courts can only consider evidence

properly presented to the plan administrator when reviewing the reasonableness an ERISA determination." *Storms v. Aetna Life Ins. Co*., 156 Fed. Appx. 756, 760 (6th Cir. 2005).  Here, there is no evidence that Carpenter submitted the SSDI award letter to UOO during its review of her claim and Carpenter does not contend that she did so.  Therefore, the Court may not consider Carpenter's SSDI award in its determination of whether or not UOO's determination was arbitrary and capricious.

### 4.  Conclusions and Remedy

Considering the factors discussed above, the Court concludes that UOO's denial of disability benefits to Carpenter was arbitrary and capricious.  The Court is troubled by UOO's determination that the available medical documentation did not support Carpenter's reported restrictions when it never had a physician examine her or provide a full analysis of her claim. The Court is also troubled by the failure of UOO to clearly articulate a basis for its conclusions and for its ultimate denial of Carpenter's claim.  Finally, an inherent conflict of interest exists because UOO both reviews claims and pays benefits.  The Court believes that, as a whole, these factors support a finding that Defendant's denial of Carpenter's claim was not the result of a deliberate principled reasoning process and was not supported by substantial evidence. However, the Court does not believe the record clearly establishes that Plaintiff is entitled to long term disability benefits. Therefore, this case is remanded to Defendant to conduct a full and fair review. *See, e.g., Elliott v. Metro. Life Ins. Co. of N. Am.,* 473 F.3d 613, 622 (6th Cir.2006) (remand to MetLife appropriate where the Court did not find that the plaintiff was "clearly entitled to benefits")).

## II.  <u>State Law Claims Pre-Empted by ERISA</u>

In her complaint, Carpenter asserts a state law claim against UOO for consequential and punitive damages for UOO's bad faith refusal to pay Plaintiff's claim for benefits.  ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The United States Supreme Court and Sixth Circuit Court of Appeals have held that under 29 U.S.C. § 1144(b), an ERISA action preempts state law claims by beneficiaries who sue for the recovery of benefits in connection with an ERISA plan. *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 737-738 (1985); *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41 (1987) *Daniel v. Eaton Corp.,* 839 F.2d 263, 266-67 (6th Cir.1988). "[I]n interpreting ERISA's preemption clause, a court 'must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.'" *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.,* 399 F.3d 692, 698 (6th Cir.2005) *(quoting N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995)).

 In *Briscoe v. Fine,* the Sixth Circuit Court of Appeals held that "'any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore preempted.'"  *Briscoe v. Fine,* 444 F.3d 478, 498 (6th Cir.2006) (quoting *Aetna Health, Inc. v. Davila,* 542 U.S. 200, 209 (2004)).  In order to determine whether or not a state law claim is preempted by 29 U.S.C. § 1144(a), the Court must find that the claim is "related to" the recovery under the ERISA plan.  In looking at whether a state law claim relates to an ERISA plan, courts should consider "the kind of relief that plaintiffs seek, and its relation to the pension plan." *Ramsey v. Formica Corp.,* 398 F.3d 421, 424 (6th Cir.2005).

20

The Supreme Court and the Sixth Circuit have clearly held that a state-law claim for breach of fiduciary duty and/or bad faith is preempted by ERISA.  *Pilot Life Ins. v. Dedeaux*, 481 U.S. 41 (1987) (holding that bad faith claim arising out of failure to pay benefits was preempted under ERISA); *Smith v. Provident Bank*, 170 F.3d 609, 612-13 (6th Cir. 1999). Accordingly, Carpenter's state law claims against Defendant are preempted by ERISA.

## CONCLUSION

For the foregoing reasons, the Court grants judgment for Plaintiff.  Count II of Plaintiff's complaint is dismissed.  This matter is REMANDED to Defendant for a full and fair review in light of the Court's instructions.